UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

New England College

      v.                                 Civil No. 08-cv-424-JL
                                           Opinion No. 2009 DNH 158

Drew University,
and Anne Marie Macari

**MEMORANDUM ORDER**

This case involves a dispute between two colleges over poetry in motion.  The plaintiff, New England College ("NEC"), has sued Drew University ("Drew") and Anne Marie Macari, alleging that while Macari was serving as interim director of NEC's graduate poetry program, she secretly conspired with Drew to develop a similar program and to solicit NEC faculty and students to affiliate with Drew.  NEC has brought claims of breach of fiduciary duty, breach of contract, and intentional interference with various contractual and other relationships, including between NEC and its faculty and students.

Drew filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue to the District of New Jersey (where Drew is located), arguing that it has insufficient contacts with New Hampshire (where NEC is located).  This court denied the motion on February 17, 2009, without prejudice to its reinstatement after a period of

jurisdictional discovery.  See New Eng. College v. Drew Univ.,
2009 DNH 016, 10.

Drew has now reinstated the motion.  This court has subject-
matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).
After hearing oral argument and evaluating the parties' written
submissions, including discovery materials, this court denies
Drew's motion.  Although the court initially had been "inclined
to grant" the motion because NEC had presented only "speculation
without any evidentiary foundation," id. at 5, 9, jurisdictional
discovery has enabled NEC to make a prima facie showing —
sufficient to establish personal jurisdiction over Drew — that
Drew authorized or at least ratified Macari's efforts to move the
poetry program to Drew, such that her conduct in New Hampshire
can be imputed to Drew for jurisdictional purposes.  In addition
to Macari's efforts, Drew purposefully directed its out-of-forum
activities at NEC in New Hampshire with knowledge that they would
have significant in-forum effects.

**I.  <u>Applicable legal standard</u>**

The plaintiff bears the burden of showing personal
jurisdiction over the defendants.  See Hannon v. Beard, 524 F.3d
275, 279 (1st Cir.), cert. denied, 126 S. Ct. 726 (2008).  When
evaluating a defendant's motion to dismiss for lack of personal

jurisdiction, the standard of review varies according to the procedural posture of the case. See Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 674-78 (1st Cir. 1992). Where, as here, the court rules on such a motion without holding an evidentiary hearing, it applies a "prima facie" standard of review.[1] See, e.g., U.S. v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). "Under the prima facie standard, the inquiry is whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008), cert. denied, 129 S. Ct. 999 (2009). The court must accept the plaintiff's evidentiary proffers as true, so long as they are properly documented, and must construe them in the light most favorable to the existence of jurisdiction. Id. Facts put forward by the defendants may be considered only if they are "uncontradicted" by the plaintiff's submissions. Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34

---

[1]Drew did not request an evidentiary hearing or a different standard of review in its motion to dismiss. The court of appeals has said that "all litigants effectively are on notice that motions to dismiss for want of personal jurisdiction will be adjudicated under the prima facie standard unless the court informs them in advance that it will apply a more demanding test," which has not happened here. Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 84 (1st Cir. 1997) (emphasis in original). Drew therefore waived any argument for a different standard of review.

(1st Cir. 1998).  The following statement of facts conforms to those requirements.

## II.  **Background**

In March 2007, Macari accepted an offer to become interim director of the graduate poetry program at NEC in Henniker, New Hampshire, where she had been a faculty member.  The program, which involved long-distance learning punctuated by brief periods of residency with prominent poets, was billed by NEC as the only all-poetry program of its kind.

About a month later, without telling NEC, Macari met with Drew's president and other representatives in New Jersey to discuss the possibility of developing a similar poetry program at Drew.  Macari told them about her interim position at NEC and said that she could bring a good faculty with her to Drew, including some of the poets affiliated with NEC's program.

Macari, who lived in New Jersey, returned to New Hampshire shortly thereafter to direct the NEC program's summer residency. While in New Hampshire, she spoke with various NEC faculty members about possibly affiliating with Drew, and some of them expressed interest in doing so.  She did not tell anyone else at NEC about her plans.

4

Macari met with Drew officials again in New Jersey at the end of the summer.  In advance of the meeting, she provided them with background materials regarding the proposed program, such as a potential faculty list that included various NEC faculty members, budget notes that were based in part on "the budget that I have from our school," and a curriculum similar to that of NEC's program.  At the meeting, the parties discussed "bringing most of our faculty from NEC" to Drew.  Drew also agreed to accept NEC transfer students with full credit for their prior coursework and "the same tuition and scholarships as was given to them at NEC."

After that second meeting, Macari continued to work on a more detailed budget proposal.  She sent Drew two versions in October 2007.  The first version "assume[d] that most of our students [will] follow us" from NEC to Drew, and the other version assumed the opposite.  Macari expressed concern that a delayed start to Drew's program "may well mean that our students at NEC will get used to the new director and will chose [sic] not to follow us to Drew," but added, "[o]f course I hope that most of them will follow us."  Her budget included detailed information about NEC's tuition rates, scholarship funding, advertising methods, and faculty salaries.  She told Drew that the cost of linens during residency periods was the "only detail

I can't seem to pin down without giving myself away too much to my coworker [i.e., the program administrator] at NEC."

Macari collaborated with a Drew professor, Peggy Samuels, to develop a written sales pitch to be used in gaining approval for the poetry program from the relevant committees at Drew.  The sales pitch stated that the program had "used NEC as its institutional home" for the past fifteen years and that Macari was "seek[ing] to find a new institutional home for the program," which "already has a strong national reputation."  The sales pitch noted that the budget projections were based on the previous known costs of NEC's program.  One of Drew's faculty members commented approvingly that "this MFA [program] is hardly starting from scratch -- rather, it is being transplanted more or less whole to a new institutional home.  Its faculty are already in place."  A summary that Drew provided to its Academic Affairs Committee also stated that it was "expected that a number of [NEC] students will follow the faculty to Drew."

When the program received a favorable vote from Drew's Academic Affairs Committee in December 2007, Professor Samuels wrote to Macari:  "I'm glad we managed to get to this [p]oint before the Jan[uary] Res[idency] so that you can spread the word there a bit."  Samuels acknowledged at her deposition that

6

"there" meant NEC and that she was asking Macari to spread the word about Drew's new program.

Macari announced her resignation from NEC in February 2008, after the January residency period.  The news came as a surprise to NEC officials, who still knew nothing of her plans with Drew. Macari had felt like she was simultaneously "doing 2 jobs, one of them [with Drew] is covert and doesn't pay (yet), and the other one [with NEC] is horrible and pays poorly."  After breaking the news to NEC, she admitted to Drew officials that "it has been a real strain for me to be trying to do right by both Drew and NEC and I am relieved to be finished with NEC now."

The presidents of Drew and NEC later discussed the matter by phone, and Drew's president indicated that Drew might take a few faculty members from NEC's program but would not be soliciting any of NEC's students.  There is evidence, however, that Macari affirmatively contacted at least one incoming NEC student about Drew's program and also reported to Drew's president on NEC student interest in Drew.  Ultimately, several NEC faculty members and students did affiliate with Drew's program.  NEC claims that its program suffered lower enrollment and other adverse effects because of Drew's actions.

III. **Analysis**

A. *Personal jurisdiction*

There is no claim here that the court has general jurisdiction over Drew.  See <u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 57 (1st Cir. 2005) (explaining the difference between general and specific jurisdiction).  NEC bases its claim of specific personal jurisdiction over Drew on the New Hampshire long-arm statute, which provides that "jurisdiction over nonresidents may be exercised whenever the requirements of the Due Process Clause of the United States Constitution are satisfied."  <u>Alacron, Inc. v. Swanson</u>, 145 N.H. 625, 628 (2000); <u>see</u> U.S. Const. amend. XIV. The court therefore proceeds directly to the due process analysis.

Due process under the Fourteenth Amendment requires that a defendant have "sufficient minimum contacts with the [forum] state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" <u>Adelson v. Hananel</u>, 510 F.3d 43, 49 (1st Cir. 2007) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)) (further quotation omitted).  Specific jurisdiction consists of three elements:  First, the defendant must have "purposefully directed" its activities at the forum state.  <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 774 (1984) (purposeful availment).  Second,

8

each of the plaintiff's causes of action must be "related to or arise[] out of" those forum-directed activities.  <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984) (relatedness).  Third, the exercise of jurisdiction must be reasonable.  <u>See</u> <u>Phillips</u>, 530 F.3d at 27.

As to purposeful availment, NEC has proffered evidence that, if accepted as true and construed in the light most favorable to NEC, shows that Drew purposefully directed its activities at New Hampshire.  The evidence would support an inference that Drew and Macari sought, in effect, to relocate an established poetry program from NEC in New Hampshire to Drew in New Jersey and to bring along NEC faculty and students.  Many of Drew's documents describe their plans in precisely that manner (e.g., as creating a "new institutional home" for NEC's program).  The evidence also would support an inference that Drew encouraged Macari to secretly gather information about NEC's budget and operations in New Hampshire for use by Drew in developing its rival program. All of these actions were aimed directly at a New Hampshire institution.

In perhaps the clearest example of purposeful availment, Drew expressly asked Macari to "spread the word" about its new program at NEC while directing her last residency there.  This request cannot be brushed aside as a single, isolated statement.

When viewed (as it must be) in the context of their other communications and construed in the light most favorable to NEC, the statement is a clear instruction from Drew to Macari to follow through on their express plan to lure faculty and students from NEC to Drew, as just approved by Drew's Academic Affairs Committee.

Drew argues that there is no evidence that any of its representatives ever visited New Hampshire in connection with this matter or committed any relevant acts here.  This argument fails for two reasons.  First, Macari committed a number of relevant acts in New Hampshire on Drew's behalf and with Drew's knowledge.  It is well established that a plaintiff's jurisdictional showing "may rely in whole or in part on actions imputed to [an entity] through its agents."  Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd., 298 F.3d 1, 7 (1st Cir. 2002).  The agent can either be "initially authorized to act on behalf of a principal" or the principal can "later ratif[y] the agent's conduct."  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002).  The key question is not whether an agency relationship technically exists under state law, but whether a sufficient relationship exists to attribute the agent's acts to the principal under the Due Process Clause. Jet Wine, 298 F.3d at 7; see also Daynard, 290 F.3d at 56.

10

Here, there is ample evidence that Drew authorized or at least ratified Macari's acts in New Hampshire (e.g., telling her to "spread the word" of Drew's program at NEC; using her NEC-based budget). Macari admits that she felt like she was doing two jobs, one overtly for NEC and one covertly for Drew. Indeed, she was introduced to Drew's graduate faculty in November 2007 as "the new director for the proposed MFA in poetry program."[2] Under the circumstances, her conduct can reasonably be attributed to Drew for purposes of the jurisdictional analysis. See Donatelli v. Nat'l Hockey League, 893 F.2d 459, 468 (1st Cir. 1990) (explaining that jurisdictional agency issues must be based on a "frank appraisal of the realities surrounding any given relationship").[3]

-----

[2] At oral argument, Drew stated that the new program did not receive final approval until February 2008, just before Macari resigned from NEC, and that Macari did not become a paid employee of Drew until March 2008. But construed in the light most favorable to NEC, the record nevertheless suggests that approval of the new program became a near certainty when it received a favorable vote from Drew's Academic Affairs Committee in December 2007 and that Macari acted with Drew's authorization and ratification long before she became a paid employee.

[3] This agency theory of jurisdiction is distinct from the conspiracy theory of jurisdiction that this court analyzed in its earlier order granting jurisdictional discovery. See New Eng. College, 2009 DNH 016, at 7 (noting that the First Circuit has never recognized the conspiracy theory). Because jurisdictional discovery revealed evidence to support a more direct agency relationship, NEC no longer relies primarily on the conspiracy theory to support jurisdiction over Drew (though it has preserved the argument).

Second, even if there were no evidence that Drew's representatives or agents committed relevant acts while physically present in New Hampshire, such evidence is not always required.  Under the "effects" theory of personal jurisdiction, first recognized by the Supreme Court in <u>Calder v. Jones</u>, 465 U.S. 783 (1984), a court may properly assert jurisdiction where a defendant has committed "intentional, and allegedly tortious, actions" outside the forum state that "were expressly aimed at" the forum state with knowledge that "the brunt of [the] injury would be felt" there.  <u>Id.</u> at 789-90.  As the court of appeals has explained, "knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions."  <u>N. Laminate Sales, Inc. v. Davis</u>, 403 F.3d 14, 26 (1st Cir. 2005) (quoting <u>Hugel v. McNell</u>, 886 F.2d 1, 4 (1st Cir. 1989)).[4]

---

[4]The court of appeals has repeatedly cautioned that the "effects" theory requires more than the mere existence of in-forum effects.  <u>See</u>, <u>e.g.</u>, <u>Swiss Am. Bank</u>, 274 F.3d at 625; <u>Mass. Sch. of Law</u>, 142 F.3d at 36; <u>see also</u> <u>PFIP, LLC v. You-Fit, Inc.</u>, 2009 DNH 059, 38 n.22 (explaining that <u>Northern Laminate</u>, quoted above, is consistent with that principle).  In this case, NEC's prima facie showing of jurisdiction is based not merely on the existence of such effects, but on Drew's intentional conduct aimed at New Hampshire.

The court of appeals has held in multiple cases, including one decided yesterday, that intentional interference with an in-forum contract or business relationship can establish jurisdiction under the "effects" theory.  See Astro-Med, Inc. v. Nihon Kohden Am., Inc., Nos. 08-2334 & 08-2335, 2009 WL 3384786, at *5-6 (1st Cir. Oct. 22, 2009) (exercising jurisdiction where nonresident defendant hired employee knowing that he had an in-forum employment agreement, even though neither the defendant nor the employee engaged in any relevant in-forum conduct); Jet Wine, 298 F.3d at 10-11 (exercising jurisdiction where nonresident defendants terminated plaintiff's right to distribute certain liquor brands in New Hampshire).  While the precise contours of the jurisdictional analysis continue to be debated, see, e.g., Astro-Med, 2009 WL 3384786 at *15-16 (Howard, C.J., concurring) (arguing for a slightly less demanding test in business tort cases), this case clearly meets the standard if those cases do. The evidence here -- more so than in Astro-Med -- supports an inference that Drew's actions were both intended to and did have a significant impact on an established competitor in New Hampshire, such that Drew could reasonably expect to be haled into this forum to defend its actions.

13

As to the relatedness component of the jurisdictional analysis, all of NEC's causes of action against Drew directly relate to or arise from Drew's conduct directed at New Hampshire, including but not limited to the imputed conduct by Macari inside New Hampshire.  Cf. Astro-Med, 2009 WL 3384786 at *6 (finding sufficient relatedness to a tortious interference claim even without any relevant in-state conduct by the employee).  For example, NEC has brought claims for intentional interference with its existing and/or prospective contractual relations with faculty and students, and Drew's conduct involved efforts to lure NEC faculty and students from New Hampshire to New Jersey.  There is a clear "causal nexus" between the contacts and the claims.  Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999) (noting also that "there is a natural blurring of the relatedness and purposeful availment inquiries in cases in which the alleged contacts are less tangible than physical presence," but they are nonetheless distinct inquiries that share a "family resemblance").

Drew has devoted much of its renewed motion to arguing, based on the jurisdictional discovery, that NEC's causes of action lack merit.  For example, Drew argues that Macari was an at-will employee whose employment would have been terminated anyway and who was free to start a new program with Drew.  Drew

14

also notes that, to date, the record contains no faculty or student contracts other than Macari's at-will agreement.  This is not, however, the appropriate time to determine the ultimate merits of NEC's claims, which are at least colorable as described in NEC's pleadings and other filings.  See, e.g., Jet Wine, 298 F.3d at 4, 8 (ruling that, "whatever the ultimate merits of Jet Wine's substantive claims," a "plausible" contractual interpretation was "sufficient for a prima facie showing of jurisdiction" and that the merits "may be resolved later").  Whether meritorious or not, the claims each arise from Drew's conduct directed at NEC in New Hampshire, which is the relevant issue for purposes of jurisdiction.

As to the third element, reasonableness is not a barrier to this court's jurisdiction over Drew.  The Supreme Court's familiar "gestalt factors" guide the reasonableness determination.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  They include the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the defendant's burden of appearing; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the states in furthering fundamental substantive social policies.  United Elec., Radio and Mach. Workers of Am. v.

15

163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)

(citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477

(1985)).

     The factors favoring litigation in New Hampshire include, in

this case, New Hampshire's interest in redressing harms against

its residents and NEC's interest in obtaining convenient and

effective relief from a court in its own state.  See N. Laminate,

403 F.3d at 26 (citing similar factors).  Both New Hampshire and

New Jersey -- Drew's preferred forum -- would be efficient places

to resolve the controversy.  The only factor in New Jersey's

favor is the defendant's burden of appearing, and Drew has

presented no persuasive reasons why the burden of defending a

suit in New Hampshire from New Jersey outweighs the factors

favoring New Hampshire.  See id.

     Stepping back to the fundamental principles of the

constitutional analysis, it is entirely consistent with "fair

play and substantial justice" for Drew to be called to answer in

New Hampshire for its efforts to move an established poetry

program from this state to its campus in New Jersey.  Int'l Shoe,

326 U.S. at 316.  The court therefore denies Drew's motion to

dismiss for lack of personal jurisdiction.

**B.   *Venue***

As an alternative to dismissal, Drew requests that this
court transfer venue to the District of New Jersey, where Drew is
located.  A district court may transfer a civil action to any
other district where it may have been brought "[f]or the
convenience of parties and witnesses, in the interest of
justice."  28 U.S.C. § 1404(a).  The court has wide latitude in
determining whether to grant such a transfer.  Auto Eur., LLC v.
Conn. Indem. Co., 321 F.3d 60, 64 (1st Cir. 2003).  There is,
however, "a strong presumption in favor of the plaintiff's choice
of forum," which the party requesting transfer must overcome.
Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000) (citing
Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).  This
presumption is particularly strong where, as here, the plaintiff
has chosen its home state as the forum.  Sousa v. TD Banknorth
Ins. Agency, Inc., 429 F. Supp. 2d 454, 457 (D.N.H. 2006)
(Barbadoro, D.J.) (citing Piper Aircraft Co. v. Reyno, 454 U.S.
235, 255 (1981)).

Drew has not met the demanding standard for a transfer.  Any
convenience that Drew and Macari would gain from litigating in
New Jersey would be offset by the inconvenience that NEC would
suffer from litigating outside of New Hampshire.  The operative
events occurred in both jurisdictions.  Witnesses and evidentiary

17

materials are located in both jurisdictions.  To the extent that the New Jersey witnesses may outnumber the New Hampshire witnesses and would be beyond this court's subpoena power, many of them are affiliated with Drew and thus would be likely to comply with a request from Drew that they testify.  See id. at 458.  Several witnesses already have been deposed and thousands of pages already have been produced in connection with jurisdictional discovery, with no serious forum-related problems reported or alleged by Drew.  Either of the two jurisdictions would have been an appropriate and efficient forum.  The plaintiff chose New Hampshire, its home state, and the defendant has not provided a compelling basis for this court to override that choice.  Drew's request for a venue transfer is therefore denied.

## IV.  __Conclusion__

For the foregoing reasons, Drew's renewed motion to dismiss for lack of personal jurisdiction[5] is DENIED.  That motion's request to transfer venue to the District of New Jersey is also DENIED.

---

[5]Document no. 36.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:     October 23, 2009

cc:        William D. Pandolph, Esq.
           John J. Peirano, Esq.
           Kimberly A. Capadona, Esq.
           Martha Van Oot, Esq.
           John G. Vanacore, Esq.